1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ASHLEY ROSS, Derivatively on Behalf of STARBUCKS CORPORATION,<br><br>    Plaintiff,<br><br>        v.<br><br>LAXMAN NARASIMHAN, RICHARD E. ALLISON, JR., ANDREW CAMPION, BETH FORD, MELLODY HOBSON, JORGEN VIG KNUDSTORP, NEAL MOHAN, DANIEL SERVITJE, MIKE SIEVERT, WEI ZHANG, SATYA NADELLA, and RACHEL RUGGERI,<br><br>    Defendants,<br><br>        and,<br><br>STARBUCKS CORPORATION,<br><br>    Nominal Defendant. | Case No:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Ashley Ross ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of nominal defendant Starbucks Corporation ("Starbucks" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint") against current and former members of Starbucks' board of directors (the "Board") and certain of its executive officers. Plaintiff's allegations are based upon Plaintiff's personal knowledge as to Plaintiff's and Plaintiff's own acts, and upon information and belief developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information such as filings with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, and matters of public record, including legal filings in the securities class action *Garbaccio v. Starbucks Corp., et al.,* Case No. 2:24-cv-01362-JHC (W.D. Wash.) (the "Securities Class Action"), as well as other publicly available information.

## INTRODUCTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Starbucks against certain of its officers and directors, seeking to remedy violations of state and federal law between at least November 2, 2023 and April 30, 2024, inclusive (the "Relevant Period").

2.      Starbucks is a publicly traded global coffeehouse chain based in Seattle, Washington. The majority of Starbucks' revenue comes from selling handcrafted coffee and tea beverages in its company-operated stores in the United States and China, Starbucks' largest and second largest markets, respectively.

3.      This derivative action concerns material misstatements made by the Individual Defendants (defined below) regarding Starbucks' triple-shot reinvention plans, which were intended

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

to elevate Starbucks' brand globally, improve long-term growth, and enhance Starbucks' internal operations.

4.    During the Relevant Period, the Individual Defendants told investors that the reinvention plans were "fueling revenue growth" and delivering "improved partner and customer experiences," store "traffic continues to be strong and it's growing," and the reinvention plans were creating "exciting momentum in China."

5.    In actuality, the Individual Defendants were aware of or recklessly disregarded the fact that the reinvention plans were causing store traffic, a Starbucks financial metric that reports the number of sales at existing company-operated stores, to decline in both markets.

6.    The Individual Defendants knew but failed to disclose that a proprietary staffing algorithm implemented as part of the reinvention plans was causing systemic understaffing at U.S. company-operated stores. This understaffing led to frustratingly long wait times and was driving customers away. Moreover, aggressive price wars by Starbucks' competitors were causing store traffic to decline in China.

7.    The relevant truth concealed by Defendants' fraud was revealed to Starbucks' shareholders on April 30, 2024, when Starbucks released its Q2 2024 earnings results and lowered its full-year 2024 fiscal guidance. The release shocked investors, reporting that North America and U.S. comparable store sales declined 3%, driven by a 7% decline in store traffic, and China comparable store sales declined 11%, driven by a 4% decline in store traffic.

8.    During an earnings call, hosted by Starbucks on the same day, the Company attributed the disappointing results in part to longer wait times, macro conditions, and "fierce competition among value players in the [Chinese] market." Several analysts noted that Starbucks Q2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 3

2024 performance was the weakest store traffic performance outside of the pandemic and the global financial crisis.

9.      In response to these results, the price of Starbucks stock plummeted 15% in one day, from a closing price of $88.49 per share on April 30, 2024 to a closing price of $74.44 per share on May 1, 2024.

10.      As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability and costs related to defending itself in the Securities Class Action.

11.      Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, over the claims asserted herein arising under Sections 14(a) and 10(b) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78j(b), and the rules promulgated thereunder by the Securities and Exchange Commission ("SEC"), including Rule 14a-9, 17 C.F.R.§240.14a-9, and Rule 10b-5, 17 C.F.R.§240.10b-5.

13.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 4

14. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities exchange.

17. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391 because Starbucks is headquartered in this District, Defendants transact business in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## **PARTIES**

18. Plaintiff is a current Starbucks shareholder and has continuously held Starbucks shares at all relevant times.

19. **Nominal Defendant Starbucks** is incorporated under the laws of Washington with its principal executive offices at 2401 Utah Avenue South, Seattle, Washington 98134.

20. Starbucks' common stock is traded on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "SBUX."

21. **Defendant Laxman Narasimhan ("Narasimhan")** served as Starbucks' Chief Executive Officer ("CEO") and as a member of the Board from March 2023 through August 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 5

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

According to the proxy statement filed on Schedule 14A with the SEC on January 24, 2025 (the "2025 Proxy"), during the 2024 fiscal year,[1] Defendant Narasimhan received $21,530,692 in total compensation from the Company. According to the 2025 Proxy, as of January 10, 2025, Defendant Narasimhan beneficially owned 39,677.9 shares of Starbucks common stock, with a market value of approximately $3.94 million.[2] Defendant Narasimhan is named as a defendant in the Securities Class Action.

22.     **Defendant Richard E. Allison, Jr. ("Allison")** has served as a member of the Board since September 2019 and serves as a member of the Audit and Compliance Committee (the "Audit Committee"). According to the 2025 Proxy, during the 2024 fiscal year, Defendant Allison received $329,979 in total compensation from the Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Allison owned 10,000 shares of Starbucks common stock worth approximately $992,500, together with 21,553.252 Deferred Stock Units.[3]

23.     **Defendant Andrew Campion ("Campion")** has served as a member of the Board since September 2019 and serves as Chair of the Audit Committee. According to the 2025 Proxy, during the 2024 fiscal year, Defendant Campion received $339,965 in total compensation from the Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Campion beneficially owned 21,768.252 Deferred Stock Units.

24.     **Defendant Beth Ford ("Ford")** has served as a member of the Board since January 2023. According to the 2025 Proxy, during the 2024 fiscal year, Defendant Ford received $336,746

---

[1] 2024 Fiscal year refers to the fiscal year ended October 1, 2024.

[2] Valuations of the Individual Defendants' personal holdings of Company stock are based on the $92.25 per share closing price of Starbucks common stock on January 10, 2025.

[3] Defined as "the number of stock units held under [Starbucks'] Deferred Compensation Plan for Non-Employee Directors."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 6

1  in total compensation from the Company. Also according to the 2025 Proxy, as of January 10,

2  2025, Defendant Ford beneficially owned 7,030 Deferred Stock Units.

3        25.    **Defendant Mellody Hobson ("Hobson")** served as a member of the Board from

4  January 2005 until her retirement from the Board in March 2025. According to the 2025 Proxy,

5  during the 2024 fiscal year, Defendant Hobson received $494,969  in total compensation from the

6  Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Hobson benefi-

7  cially owned  664,560  shares  of  Starbucks  common  stock,  worth  $61.3  million,  along  with

8  63,350.98 Deferred Stock Units.

9        26.    **Defendant Jorgen Vig Knudstorp ("Knudstorp")** has served as a member of the

10  Board since 2017 and serves as a member of the Audit Committee. According to the 2025 Proxy,

11  during the 2024 fiscal year, Defendant Knudstorp received $329,979 in total compensation from

12  the Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Knudstorp

13  beneficially  owned  18,380  shares  of  Starbucks  common  stock,  worth  $1.7  million,  along  with

14  17,968.638 Deferred Stock Units.

15        27.    **Defendant Neal Mohan ("Mohan")** has served as a member of the Board since

16  January 2024 and is a member of the Board's Governance Committee. According to Starbucks'

17  2025 Proxy, Defendant Mohan received $373,602 in total compensation from the Company during

18  the 2024 fiscal year. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Mohan

19  beneficially owned 4,153 Deferred Stock Units.

20        28.    **Defendant Daniel Servitje ("Servitje")** has served as a member of the Board since

21  January 2024 and is a member of the Board's Environmental, Partner, and Community Impact

22  Committee. According to Starbucks' 2025 Proxy, Defendant Servitje received $373,602 in total

23

24

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

compensation from the Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Servitje beneficially owned 4,153 shares of Deferred Stock Units.

29.    **Defendant Mike Sievert ("Sievert")** has served as a member of the Board since January 2024 and is a member of the Board's Compensation and Management Development Committee. According to Starbucks' 2025 Proxy, Defendant Sievert received $373,602 in total compensation from the Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Sievert beneficially owned 4,070 shares of Starbucks common stock, worth $375,457.50.

30.    **Defendant Wei Zhang ("Zhang")** has served as a member of the Board since October 2023 and serves as a member of the Audit Committee. According to the Company's 2025 Proxy, during the 2024 fiscal year, Defendant Zhang received $309,917 in total compensation from the Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Zhang beneficially owned 5,304 Deferred Stock Units.

31.    **Defendant Satya Nadella ("Nadella")** served as a member of the Board from 2017 until May 30, 2024. According to the 2025 Proxy, during the 2024 fiscal year, Defendant Nadella received $309,917 in total compensation from the Company.

32.    **Defendant Rachel Ruggeri ("Ruggeri")** has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President ("EVP") since February 2021. According to the 2025 Proxy, during the 2024 fiscal year, Defendant Ruggeri received $6,627,008 in total compensation from the Company. Also according to the 2025 Proxy, as of January 10, 2025, Defendant Ruggeri beneficially owned 26,420 shares of Starbucks common stock, worth $2.6 million, together with 5,107 Restricted Stock Units. Defendant Ruggeri is named as a defendant in the Securities Class Action.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

33. **Non-Party Marissa Mayer ("Mayer")** has served as a member of the board since June 2025 and serves as a member of the Nominating and Corporate Governance Committee. According to a current report filed on Form 8-K with the SEC on June 26, 2025 (the "June 2025 Form 8-K"), Mayer participates in the Company's compensation program for non-employee directors. Mayer is named herein solely for the purposes of demand futility.

34. **Non-Party Brian Niccol ("Niccol")** has served as the Company's CEO and as Chairman of the Board since September 2024. According to the 2025 Proxy, during the 2024 fiscal year, Niccol received $95,801,676 in total compensation from the Company. Niccol is named herein solely for the purposes of demand futility.

35. **Non-Party Dr. Dambisa Moyo ("Moyo")** has served as a member of the Board since June 2025 and serves as a member of the Audit Committee, as well as the Nominating and Corporate Governance Committee. According to the June 2025 Form 8-K, Moyo participates in the Company's compensation program for non-employee directors. Moyo is named herein solely for the purposes of demand futility.

## SUBSTANTIVE ALLEGATIONS

### Factual Background

36. In September 2022, the Individual Defendants unveiled a three-year Reinvention plan designed to elevate Starbucks' brand globally, accelerate long-term growth, and enhance operating efficiencies.

//
//
//

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

37.    The Reinvention Plan promised a sharp increase in comparable store sales growth[4] to a range of 7% to 9% annually from FY 2023 to FY 2025, both globally and in the United States, up from a more modest range of 4% to 5%.

38.    In China, the Individual Defendants told investors that Starbucks expected outsized comparable store sales performance in FY 2023 and FY 2024, as the most severe impact of pandemic related lockdowns were over, with growth normalizing in the new range of 4% to 6% in FY 2025, an increase from the prior range of 2% to 4%.

39.    In conjunction with the announcement of the Reinvention Plan, Starbucks also announced a change in leadership, introducing Defendant Narasimhan as Starbucks' next CEO following a six-month immersion program.

**The Individual Defendants Implemented a Deficient Staffing Algorithm**

40.    Shortly after Defendant Narasimhan took over as CEO in March 2023, Starbucks began working on a new labor algorithm for partner scheduling and staffing. Internally called the SPA tool, the algorithm utilized a set of data such as historical trends, current trends, and product availability to forecast the number of hours needed for each store throughout the day.

41.    Unbeknownst to investors, however, the new algorithm would cause significant operational issues within company-operated stores in the United States. Specifically, the Individual Defendants failed to adjust the algorithm to accommodate the expanding time needed for increasingly complex and time-consuming drink customizations due to concurrently rising demand.

42.    As a result, the algorithm was not accurately projecting the number of partner hours needed to staff stores and meet customer demand.

---

[4] Comparable store sales, also known as "same store sales," is a Starbucks financial metric that reports the revenue generated by company-operated stores that have been open for at least 13 months.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 10

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

43.     These understaffing problems were exacerbated by the Company's various new menu offerings, which partners had to learn on the job.  At the same time, Starbucks was also releasing several new promotional events, which led to a spike in orders that was beyond the Company's projections and was not factored in the algorithm's ability to determine how much manpower was needed.

44.     The understaffing problem was further compounded by the fact that just prior to the Relevant Period, Starbucks laid off roughly 29,000 in-store workers in the United States (reducing the number of staff from 248,000 to 219,000) while at the same time expanding its presence in the United States by opening 380 stores.

45.     As a result of these combined pressures, Starbucks' U.S. stores were consistently understaffed and the beleaguered partners were forced to juggle in-person, drive-thru, mobile, and delivery orders, which all registered in Starbucks' system at the same time.

46.     Prior to and during the Relevant Period, internal employee surveys showed that staffing shortages and scheduling were among the top complaints for Starbucks partners and those issues were causing employee attrition.

47.     Many partners also internally reported working on short-staffed stores and getting scheduled for fewer hours than they wanted (or needed). In addition, Starbucks implemented new policies requiring partners to work a minimum of 12 hours per week, which was reducing the number of employees available at certain locations.

48.     Due to this systemic understaffing during the Relevant Period, Starbucks' customer experience was rapidly degrading. Food and drink order times were ballooning, which severely impacted store traffic. By November 2023, Starbucks suffered from decreased store traffic due to increased wait times, and by January 2024, over eight percent of Starbucks customers were waiting

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

between at least 15 and 30 minutes for a drink, a wait time that was considered unimaginable during the same period in 2019.

49.     At the same time, the percentage of abandoned mobile orders rose to the mid-teens, and Starbucks' customer contact center was flooded with calls from dissatisfied customers over their excessive order wait times.

50.     The Individual Defendants knew or were reckless in not knowing that the increased order wait times were causing a negative impact on U.S. store traffic.

51.     For example, Defendant Ruggeri led the Audit and Compliance Committee, which was tasking with "monitor[ing] and mitigat[ing] current and emerging labor and human capital management risks."  Although Starbucks prides itself on "regularly conduct[ing] anonymous surveys to seek feedback from our partners on a variety of topics" and claims that surveys were "reviewed by senior leadership, who analyze areas of progress or deterioration and prioritize actions and activities in response to this feedback to drive meaningful improvements in partner engagement," no change was made to address declining store traffic.

52.     The Individual Defendants were further able to assess the rate at which orders were not completed and why they were not completed by tracking orders placed by Starbucks Rewards members on the Starbucks Mobile Order & Pay ("MOP") app, yet the Individual Defendants failed to address declining store traffic.

**The Individual Defendants Concealed that Starbucks Sales in China Were Being Impacted by Fierce Competition**

53.     At the same time, Starbucks' China business was facing increased competition from a growing number of specialty coffee chains, local cafés, and premium coffee brands that was causing the Company's sales in China to sharply decline. Starbucks' biggest competitors, Cotti

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 12

and Luckin, were aggressively lowering prices to gain market share and outpacing Starbucks in store openings, and were focused on a take-out centric model with which Starbucks could not compete.

54.    During the Relevant Period, Defendants knew but failed to disclose that their reinvention plans to grow sales outside of the United States, including China, were being thwarted by competition.

**The Individual Defendants' False and Misleading Statements**

55.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading. Specifically, the Individual Defendants failed to disclose that: (i) Company management lacked reliable information regarding revenue and growth projections; (ii) the Individual Defendants were understating risks related to seasonality in foreign markets, particularly in China; (iii) the Reinvention plan failed to account for macro uncertainty and competition, especially in the Chinese market; (iv) as a result, the Reinvention plan failed to meet the Company's stated measures; and (v) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

56.    On November 2, 2023, Starbucks issued a press release, announcing the Company's financial results for its fiscal year 2023 (the "FY23 Release"). The FY23 Release reported the following results:

> Global comparable store sales increased 8%, driven by a 5% increase in average ticket and 3% increase in comparable transactions; North America and U.S. comparable store sales increased 9%, driven by a 6% increase in average ticket and 3% increase in comparable transactions; International comparable store sales increased 5%, driven by a 5% increase in comparable transactions; China comparable store sales increased 2%, driven by a 4% increase in comparable transactions and 2%

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

decline in average ticket; Consolidated net revenues up 12%, to a record $36.0 billion, or 14%, excluding a 2% unfavorable impact from foreign currency translation…GAAP earnings per share of $3.58 grew 27% over prior year Non-GAAP earnings per share of $3.54 grew 20% over prior year.

57. The FY23 Release quoted Defendant Narasimhan, highlighting the "positive impact" of the Reinvention plan:

We finished our fourth quarter and full fiscal year strong, delivering on the higher end of our full-year guidance. Our Reinvention is moving ahead of schedule, fueling revenue growth, efficiency and margin expansion…Notably, we continue to see the positive impact of our Reinvention on our partner and customer experiences, proof points that we can continue to create, grow and strengthen our business while creating value for all. As we enter the current year, in the face of macro uncertainty, we remain confident in the momentum throughout our business and headroom globally. We expect sustained momentum throughout the company for years to come.

58. The FY23 Release also quoted Defendant Ruggeri, who further touted the Company's "strong" performance, stating: "Our strong full fiscal year 2023 performance demonstrated our durable long-term growth and Reinvention plan execution…We are proud that our full fiscal year 2024 guidance will be grounded on a balance of both revenue growth and margin expansion."

59. During an earnings call, hosted by the Company on the same day, Defendant Ruggeri provided the Company's 2024 fiscal guidance, stating:

First, let me start with the foundation of our growth, comparable sales growth. We expect fiscal year 2024 global comp growth to be 5% to 7%...

...For color, our fiscal year 2024 U.S. comparable store sales are expected to grow in the range of 5% to 7% as our business continues to have substantial headroom spurred by our leading innovation and technology, increasing customer loyalty and strong digital engagement as evidenced by the U.S. finishing fiscal year 2023 with strong performance of 9% comp growth.

Another positive driver of our fiscal year 2024 5% to 7% global comp growth is the performance in China, with comp expected to be in the range of 4% to 6% in Q2 through Q4, with a higher comp in Q1 as we lap prior year mobility restrictions. Such growth is fueled by our increasing digital capability, coupled with the local opportunity we see stemming from our relevant product innovation and purpose-designed stores, which are resonating with customers and driving engagement. Our new store performance, combined with our strong China comp guidance, will give another year of double-digit revenue growth in the market delivering on our

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 14

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

momentum.

Next, in thinking of our global new store growth, we expect global new store growth of approximately 7%, with approximately 75% of the growth still coming from outside of the U.S. as we continue to focus on our strategic global expansion, reaching nearly 41,000 stores globally by the end of fiscal year 2024.

Of the approximate 7% growth, we expect our U.S. store count to grow by approximately 4% in fiscal year 2024, driven by our dynamic portfolio format, expanding our whitespace opportunity.

60.     Also during the November 2, 2023 earnings call, Defendant Narasimhan was asked about "the competitive environment" in China. Defendant Narasimhan stated:

**Sara Harkavy Senatore Bank of America – Analyst:**
I had a question about China, please, which I think we've heard the competitive environment there very intense. And I was just curious if that was perhaps some of what we saw in terms of positive traffic, but perhaps a negative ticket, and then some of the investments you're making and perhaps that might be gating factors for margin expansion? The positive same-store sales, I think, certainly suggests that your business is executing well. **But just trying to get a read on competitive intensity and maybe implications for new unit economics and the margin structure for the business going forward**.

**Defendant Narasimhan:**
Our brand in China is known as [Shing Baka] and it uplifts every day for millions of customers in China. And as Rachel said, our business is also strong, 5% comp in Q4. If you look at the first half of the year versus the second half of the year, the growth difference in the second half was 20% higher than the first. One thing you should know is that if you just look at the morning daypart, the morning daypart for our business in China now is higher than it was pre-COVID.

We have very strong local innovation. And to answer your question, if you look at the transactions that Rachel mentioned, we're very comfortable with the food and beverage transactions. And what we see there, including the price realization that we have, the ticket that you mentioned specifically points to merchandise and what we had in the store, which we are still working through. But we feel very good about the competitive position of beverages, the competitive position of food. We feel very good about the cash returns of the stores that we are opening. They're very strong. The team has done a wonderful job in ensuring that the cost of builds are low, with the productivity that we have been able to accomplish in our stores. We feel good about the overall returns that we are getting there. And I'm heartened by the -- by how the business is coming together despite all the headwinds that have been there for the last couple of years.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 15

61.     On that same day, Starbucks also made a presentation titled "Reinvention Update" wherein it reiterated that the purpose of the Reinvention Plan was to "elevate the experiences in our stores for our partners and through our partners for our customers."  Defendant Narasimhan stated:

> We have strong early momentum on every key metric of our Reinvention Plan as evidenced in this morning's Q4 and fiscal year 2023 record earnings results. Globally, in the full year, we grew comps at 8%, revenues at 12% and earnings at 20%. Based on the momentum we see and prevailing trends, we set strong guidance for fiscal year 2024 to grow comps 5% to 7% with revenue growth at the low end of the 10% to 12% range and earnings growth of 15% to 20%, reflecting our confidence in the multiple paths we have to deliver double-digit revenue and earnings growth.

62.     Belinda Wong, Chairwoman & Co-Chief Executive Officer – Starbucks China ("Wong") was asked to address investor concerns about the rapid growth by lower priced coffee competitors in China. Wong responded:

> Yeah. Thank you for the question. I think we said quite a few things about competitions already, but let me just start by saying that I'm very pleased with the results that we posted in Q4 and also in FY 2023. What I meant by that is you look at the record number of stores that we've opened this year, 785 net new stores, high as ever. And you look at our transaction comp that we posted in Q4, which is just sequential improvement from Q3, the beverages that we rolled out really drove new customers transactions in-store visits. So, very pleased with the sequential improvement.
>
> Now, I spoke about the full spectrum of experience in my presentation. So let me just add some colors to that. In China, Starbucks is the only brand right now uniquely providing full categories in the space in the channels that we have. We have beverage, obviously; food, merch, coffee, full spectrum at our scale where we're very unique. We look at all dayparts, very meaningful, four dayparts that we have built out and I talked about the breakfast daypart that we're now even exceeding 2019. So that's very exciting. So four very meaningful dayparts.
>
> You look at the store portfolio that [Narasimhan] just mentioned, we probably have one of the best real estate portfolio for retail companies in China. So you look at our 6,800 stores, they are in the best locations in China which helps us to provide the full spectrum of service that we provide. So we have all that to fulfill our customers occasions needs and I am very confident that is only the beginning. The early chapters was you looked at the white space, that we haven't opened. The comp sales that we're going to continue to go drive for our existing stores that we've

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

opened, there are plenty, plenty of room to grow, a lot of headroom ahead. And we're very confident and excited. And our brand is very strong. And our partners are great. We're going to continue to move forward.

63.     Defendant Narasimhan, on the same call, added:

I'll just make one final comment on that. It's interesting when markets evolve, they tier. **This is a market. It's actually in its fairly early days and it hasn't yet fully tiered. You can get low priced coffee just down the street, but when you look for an experience, you look for something that's distinctive, you look for something that's quality, you look for something that's innovative, clearly you go to another place for it. And that's the place for Starbucks**. That's the place [Shing Baka] in China.

64.     On January 25, 2024, Starbucks filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Allison, Campion, Ford, Hobson, Knudstorp, Mohan, Nadella, Narasimhan, Servitje, Sievert, and Zhang to serve for another one-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Narasimhan and Ruggeri.

65.     Reporting the Company's fiscal year 2023 "Business Highlights," the 2024 Proxy stated the following:

In fiscal year 2023, Starbucks delivered strong performance across its global and growing portfolio. Brand strength and product innovation continue to resonate as demonstrated by our increasing loyal customer base. Starbucks also built on the execution of its long-term growth strategy with the announcement of the *Triple Shot Reinvention with Two Pumps Plan* on November 2, 2023.

66.     The 2024 Proxy further reported that "[o]perating margin expanded meaningfully in the back half of the year, driven by increased efficiency through our Reinvention Plan execution."

67.     With respect to the Company's risk oversight function, the 2024 Proxy stated:

The board has ultimate responsibility for risk oversight. We believe that a fundamental part of risk oversight is not only understanding the material risks a company faces and the steps management is taking to manage those risks, but also understanding what level of risk is appropriate for that company. The involvement of the board in reviewing Starbucks business strategy is an integral aspect of the board's

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

assessment of management's tolerance for risk and its determination of what constitutes an appropriate level of risk for Starbucks.

While the full board has ultimate responsibility for risk oversight, the board has delegated oversight responsibility for certain risks to the Audit Committee, the Compensation Committee, the Impact Committee, and the Nominating/Governance Committee. This approach allows the board to draw upon the experience and judgment of specific directors comprising each committee who have experience overseeing and managing particular risks that Starbucks faces in various areas of its business. Starbucks ERM program is designed to identify, assess, and prioritize Starbucks critical risk exposures to its business operations across various time frames, from the short-term to the long-term, and throughout the world. Risks are evaluated based on their potential magnitude, likelihood, and immediacy and are monitored over time to ensure risk profile changes are evaluated in a timely manner for existing and emergent risks.

The committees of the board play a key role in the board's risk oversight responsibility. Each of our board committees is authorized by its charter to consult at its discretion with any experts or advisors that committee members feel would be helpful. All committees receive regular reports from management responsible for monitoring and mitigating particular risk exposures as part of the ERM program, and the committee chairs provide regular reports to the full board on relevant areas of oversight.

The board believes that its leadership structure, coupled with the structure and work of the various committees described below, is appropriate and effective in facilitating board-level risk oversight.

68.     The statements identified above in the 2024 Proxy were materially false and misleading because, as detailed herein, the Reinvention plan was failing to meet the Company's stated measures due in part to its failure to account for macro uncertainty and competition in China. Further, despite the 2024 Proxy's descriptions of the Board's and its committees' oversight responsibilities with respect to internal controls over financial reporting, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

69.     On January 30, 2024, the Company announced its financial results for its first fiscal quarter of 2024 and reduced its 2024 fiscal guidance:

Our first quarter performance was strong on many measures. **Of note was the**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 18

**unwavering commitment of our most loyal customers, the growth in rewards members, tender and spend per member** . . . Despite headwinds, our brand is very strong, and that coupled with innovation and a relentless focus on our green apron partners form long-term differentiators, along with focused execution on Triple Shot Reinvention, will drive balanced and attractive earnings growth.

\* \* \*

I am proud of the significant margin expansion and double-digit earnings growth we delivered in our first quarter, as it underscores our multiple paths to earnings growth. We are executing on several levers within those multiple paths to continue delivering against our balanced growth model over the remainder of the year.

70.     During an earnings call, hosted by the Company on the same day, Defendant Narasimhan touted the "successful execution" of the Reinvention plan:

Let me walk you through the details. Our performance in the quarter was fundamentally strong. Our Q1 total company revenue was a record $9.4 billion, up 8% year-over-year. Our global comparable store sales grew 5% year-over-year, supported by a 5% comp growth in North America, driven by 4% ticket growth and 10% comp growth in China. Our global operating margins expanded by 130 basis points to 15.8% and our overall earnings per share grew 20% to $0.90. ***This speaks to the continued successful execution of our reinvention plan and the durable business we are building.***

\* \* \*

We're focused on unlocking $3 billion in efficiencies, and I'm pleased to say that we're making steady progress. Our Triple Shot Reinvention efforts delivered 130 basis points of margin expansion in the first quarter of the fiscal year. As you heard me say often, the key to our success is the experience that our partners create for our customers. We're investing in a better experience for our partners to advance our business to a more balanced growth model as we unlock efficiency. ***In the quarter, we have seen the effectiveness of the Reinvention driven investments we have made in in-store operational efficiencies such as standards, equipment innovation and scheduling improvements, leading to a more stable environment for our partners.***

\* \* \*

***We also saw great momentum in China.*** We aim to be the best in the premium market in China. Our brand equity across Starbucks and Starbucks Reserve is second to none. Based on our latest brand tracker, Starbucks continues to be the first choice in away-from-home coffee, including among the Gen Z consumers. We continue to lead in brand affinity and have a highest awareness, brand familiarity and purchase intent scores. We have the most outstanding partners in our stores with

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 19

very strong customer connection and the highest retention rates in our industry. We offer distinctive global and locally relevant product innovation anchored on superior coffee with food attachments and a morning daypart that now have surpassed pre-COVID levels.

Our loyal customers, a major part of tender, are coming more often and our loyalty program is growing. We're doing all of this while offering premium physical and digital experiences delivered across our distinctive store portfolio across other physical channels and through our digital connection and doing so at a commensurate value. This ambition of being best in premium in China is in line with our long-term growth ambitions for China.

* * *

There are 3 key elements in our China strategy.

First, we are offering more coffee forward, locally relevant product innovations and we're increasing engagement in social media channels to influencers and partnerships, which are highly effective in China. These actions are increasing awareness and have led to greater customer frequency. Second, we have made significant investments in technology, increasing our omnichannel capability, allowing us to serve more customers through new occasions. These investments have also led to a more digitized store environment, increasing efficiency of our supply chain and stores while enhancing the partner experience and strengthening our unit economics in both existing and new stores.

Finally, we're increasing the percentage of new stores opening in lower tier markets and new county cities where we see meaningfully stronger new store economics. As you can see, we moved quickly to respond and implement a plan to address these unexpected headwinds. It will take time for these action plans to be fully realized. That said, we remain confident in our Triple Shot strategy and our long-term growth. So let me share some of the progress in the quarter.

Our first Triple Shot Reinvention priority is to elevate our brand by operating great stores and driving product innovation. The best lever for elevating our brand is our store experience. We continue to raise the bar on running great stores with a focus on enhancing both our partner and customer experience.[5]

71.    During the same earnings call, analysts once again sought information on the competitive environment in the China market:

**Peter Saleh – Analyst**
. . . I did want to ask about the check dynamics going on in China. It looks like down call it 9%. It's a pretty steep decline. Can you just talk about the promotional

---

[5] All emphasis is added unless indicated otherwise.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 20

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

environment that you're seeing there, and what exactly you guys are doing to combat that? And just more specifically, should we expect this check impact to really continue for the balance of the year, or how do we think about that going forward? Thank you.

**Belinda Wong:**

Okay. Thank you for the question. Let me just address the AT decline first, the average check decline. First of all, our beverage and food sales were strong and contributed majority of our comp growth in Q1 and our AT decline, the 9% decline mainly came from two areas. One is lower sales of our higher priced merchandise as our consumers now more cautious in their spending. But the merchandise category constitutes a relatively small portion of our sales mix.

Second is the targeted promotional investments that we're making to personalize offers and reward customers' behaviors in order to drive trial frequency. Now this enabled us to optimize our sales and margin. And this is powered by China Deep Brew that helps us to design the right offers to the right cohorts of customers at the right time. So that's mainly the reasons for decline.

And you asked about the promotional environment. Let me just say this. The coffee market is evolving as [Narasimham] said and going through a transition. It's still early days and it has not yet fully tiered, right. You see mass – an influx of mass market competitors focused on fast store expansion and low-price tactics to drive trial. This will shake out over time, and yes, we're operating under an increased promotional environment.

**We're not interested in entering the price war. We're focusing on capturing high-quality but profitable sustainable growth.** Okay? And it is our aim to be the best and lead in the premium market, as Lax has said, which Starbucks has pioneered in China 25 years ago. And we will continue to focus on premium experience that is high-quality coffee and human connection.

And we have clear strategies to fuel our comp and total growth. As [Narasimhan] shared, the three points, well, the three strategies, I'll add a little bit more colors. We're going to dial up our beverage and food innovation with robust marketing activations on social media and in-store. We're going to accelerate our visualization efforts to drive innovations, sales and productivity. We're going to continue our new store expansion, in-fill in existing cities and accelerate new county city entries, as [Narasimhan] has said. We're going to dial up our omni-channel expansion, scale up our membership program, and continue to invest in our partners.

So we have all these strategies to drive our comp growth and total growth and traffic and ticket. So we are very confident in our ability to deliver our growth in a short and long term. Thank you.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 21

**The Truth Emerges**

72.    On April 30, 2024, Starbucks issued a press release, revealing disappointing financial results for the second fiscal quarter of 2024 and lowering the Company's 2024 fiscal guidance:

> Global comparable store sales declined 4%, driven by a 6% decline in comparable transactions, partially offset by a 2% increase in average ticket; Consolidated net revenues declined 2%, to $8.6 billion, or a 1% decline on a constant currency basis; GAAP operating margin contracted 240 basis points year-over-year to 12.8%, primarily driven by deleverage, incremental investments in store partner wages and benefits, increased promotional activities, lapping the gain on the sale of Seattle's Best Coffee brand, as well as higher general and administrative costs primarily in support of Reinvention; GAAP earnings per share of $0.68 declined 14% over prior year; Non-GAAP earnings per share of $0.68 declined 8% over prior year, or declined 7% on a constant currency basis.

73.    Defendants Narasimhan and Ruggeri then issued statements regarding the difficulties faced by the Company. In pertinent part, Defendant Narasimhan stated:

> In a highly challenged environment, this quarter's results do not reflect the power of our brand, our capabilities or the opportunities ahead. It did not meet our expectations, but we understand the specific challenges and opportunities immediately in front of us. We have a clear plan to execute and the entire organization is mobilized around it. We are very confident in our long-term and know that our Triple Shot Reinvention with Two Pumps strategy will deliver on the limitless potential of this brand.

74.    Defendant Ruggeri added:

> While it was a difficult quarter, we learned from our own underperformance and sharpened our focus with a comprehensive roadmap of well thought out actions making the path forward clear. On this path, we remain committed to our disciplined approach to capital allocation as we navigate this complex and dynamic environment.

75.    During an earnings call, hosted by Starbucks on the same day, Defendant Ruggeri continued to highlight the Company's "challenging operating environment," stating:

> Still, we face a challenging operating environment. Headwinds discussed last quarter have continued. In a number of key markets, we continue to feel the impact of a more cautious consumer, particularly with our more occasional customer, and a deteriorating economic outlook has weighed on customer traffic, an impact felt broadly across the industry. In the U.S., severe weather impacted both our U.S. and total company comp by nearly 3% during the quarter. The remainder of our

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 22

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

challenges were attributable to fewer visits from our more occasional customers.

Turning elsewhere. We still see economic volatility in the Middle East, but we re-main confident in the region's long-term growth opportunities. In China, we still see the effects of a slower-than-expected recovery, and we see fierce competition among value players in the market. But we are strengthening our premium position, and our team in China continues to execute with terrific rigor and heart as the mar-ket shakeout continues and as demand recovers and matures.

None of these realities are excuses. Some, like weather, are transitory. Others, like a more cautious consumer, may persist longer, but much is within our control. There are 3 execution opportunities in our U.S. business I want to expand on: first, meet the demand we have across dayparts to drive future growth; second, launch even more exciting and relevant new products while maintaining our focus on core coffee forward offerings; and third, reach and demonstrate more value for our oc-casional and non-Starbucks Rewards customers.

76.     During the earnings call, in response to a question regarding the Company's exit

rates, Defendant Narasimhan stated:

**Sara Harkavy Senatore Bank of America – Analyst:**
The first is that you talked about weather as a headwind, and then you said that lavender latte in the quarter was one of the strongest launches you've had similar to PSL. But your exit rate -- it sounds like you're saying your exit rate was largely unchanged. So I'm trying to reconcile what would appear to have been headwinds that aren't reoccurring and then very successful innovation with the guidance and the exit rates.

**Defendant Narasimhan:**
Let me address both of them by pointing to the underlying pressures that we see consumers face just in terms of what they have available to spend. So there's no question that if you take some of these transitory headwinds out, which, of course, are not an excuse in any way, and you look at the underlying headwinds particularly around the pressures that consumers face particularly with the occasional customer, what we're seeing is that's where the challenge is. It's a challenge with their traffic and it's their challenge with them coming into our stores

77.     The April 30, 2024, earnings call also exposed the truth of Starbucks' declining

store traffic in the United States. Defendant Narasimhan admitted that "challenge[s] meeting our

peak morning demand in the U.S." and "long wait times" contributed to the decline of U.S. store

traffic.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 23

78.     On this news, the price of Starbucks stock declined more than 15% in one day, from a closing price of $88.49 per share on April 30, 2024, to a closing price of $74.44 per share on May 1, 2024.

79.     Analysts also reacted negatively to the news. For instance, on May 1, 2024, Deutsche Bank issued a report which stated, with respect to the Company's operations in China, that "China remains weak amidst a cautious consumer backdrop and increasing competitive intensity, and the trimmed unit growth guide likely adds to concerns on the growth outlook."

80.     On May 29, 2024, Bloomberg published a report based on the accounts of current Starbucks employees who confirmed that Starbucks' new scheduling algorithm caused stored to be understaffed, which caused significantly longer food and drink wait times. According to those employees, the algorithm did not "adequately account for the time it t[ook] to fulfill a ballooning number of special customer requests like extra espresso shots or 12 cold foam, as well as the effect of more corporate promotions." The report further cited employees confirming that due to the understaffing, workers were "struggling to simultaneously juggle in-person, drive-thru, mobile, and delivery orders and customers were waiting longer."

**Stock Repurchases During the Relevant Period**

81.     During the Relevant Period, Starbucks repurchased its own shares at artificially inflated prices, causing substantial damage to the Company. In total, the Company expended roughly $890 million repurchasing approximately 8.9 million shares of its own common stock at prices that did not reflect the actual value of the stock. As a result, Starbucks overpaid for repurchases during the relevant period by more than $227 million.

82.     As reported in the quarterly report filed on Form 10-Q with the SEC on January 30, 2024, between October 30, 2023 and December 31, 2023, the Company repurchased 8,900,855

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 24

shares of its own common stock for a total approximate cost of $890,096,717, or an average price of about $100 per share. Given that the Company's stock was actually worth only $74.44 per share,[6] Starbucks overpaid for those purchases by approximately $227,517,071.

## DAMAGES TO THE COMPANY

### Costs Incurred and Expected in the Securities Litigation

83.    On August 8, 2024, a securities class action complaint was filed in the United States District Court for the Western District of Washington against Starbucks and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act, and SEC Rule 10b-5 promulgated thereunder, in the case captioned: *Garbaccio v. Starbucks Corporation, et al.*, Case No. 2:24-cv-01362 (W.D. Wash.).

84.    As a result of the Individual Defendants' misconduct, Starbucks now faces significant defense costs for certain officers and the Company including escalating discovery, expert, and motion-practice related expenses, indemnification and advancement payments, and the risk of substantial settlement or judgment exposure.

85.    The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

86.    These expenditures would not have been incurred absent the Individual Defendants' breaches of fiduciary duty, oversight failures, and misleading public statements.

### Operational Losses Arising from Defendants' Oversight Failure

87.    The Individual Defendants' failure to exercise adequate oversight over Starbucks' operational and strategic risks—including risks associated with international market conditions, competitive dynamics in China, seasonality, pricing pressure, and execution of the Company's

---

[6] The price at the close of trading on May 1, 2024, when the truth emerged.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 25

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Reinvention plan—allowed significant operational underperformance to accumulate unchecked. As a result, Starbucks suffered declining comparable store sales, margin contraction, inefficient promotional spending, increased labor and operating costs, and diminished returns on international expansion initiatives, particularly in the Chinese market.

88.    These losses are separate and independent from the damages arising from the related securities litigation. They reflect direct operational harm to Starbucks caused by Defendants' failure to monitor performance metrics, enforce effective disclosure and risk-management controls, and timely respond to known macroeconomic and competitive pressures. Such losses constitute concrete financial injury to the Company's revenues, margins, and long-term growth prospects that the Individual Defendants had a fiduciary duty to oversee and prevent.

### Loss of Reputation, Market Credibility, and Increased Cost of Capital

89.    Starbucks' corrective disclosures triggered a 15% decline in the Company's stock price, analyst downgrades, and widespread public criticism regarding management's execution of the Reinvention plan, oversight of international operations, and responsiveness to competitive pressures, particularly in China. As a result, Starbucks has suffered reputational harm with investors, analysts, and strategic counterparties, erosion of market credibility, and a persistent valuation discount relative to peers, impairing the Company's ability to efficiently access capital markets and increasing its cost of capital.

### Unjust Compensation Paid to Individual Defendants Who Breached Their Duties

90.    During the relevant period, Starbucks paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 26

91.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.

92.     Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described infra, for which they were compensated for.

93.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damages to the Company**

94.     As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars. Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

95.     In addition, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

96.     As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

97.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

98.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

99.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

100.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Starbucks, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

101.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

overall contribution to and furtherance of the wrongdoing. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Starbucks and at all times acted within the course and scope of such agency.

## CORPORATE GOVERNANCE

102.    Starbucks' Board members are held to the highest standards of honesty and integrity and are charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

103.    The conduct of the Director Defendants involves a knowing and culpable violation of their obligations as directors and officers of Starbucks, the absence of good faith on their part, and a reckless disregard for their duties to Starbucks and its investors.

### Fiduciary Duties of the Individual Defendants

104.    By reason of their positions as officers and/or directors of Starbucks, and because of their ability to control the business and corporate affairs of Starbucks, the Individual Defendants owed Starbucks and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Starbucks in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Starbucks and its shareholders so as to benefit all shareholders equally.

105.    Each director and officer of the Company owes to Starbucks and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 29

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

106.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Starbucks, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

107.    To discharge their duties, the officers and directors of Starbucks were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

108.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Starbucks, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

109.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that Starbucks implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

110.    To discharge their duties, the officers and directors of Starbucks were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Starbucks were required to, among other things:

- Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Washington and the United States, and pursuant to Starbucks' own Standards of Business Conduct (the "Code of Conduct");

- Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Remain informed as to how Starbucks conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

- Establish and maintain systematic and accurate records and reports of the business and internal affairs of Starbucks and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

- Maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Starbucks' publicly disclosed financial information would be accurate;

- Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

- Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

- Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 31

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    of the subjects and duties set forth above.

2        111.    Each of the Individual Defendants further owed to Starbucks and the shareholders

3    the duty of loyalty requiring that each favor Starbucks' interest and that of its shareholders over

4    their own while conducting the affairs of the Company and refrain from using their position, in-

5    fluence, or knowledge of the affairs of the Company to gain personal advantage.

6        112.    At all times relevant hereto, the Individual Defendants were the agents of each other

7    and of Starbucks and were at all times acting within the course and scope of such agency.

8        113.    The Individual Defendants, because of their positions of control and authority, were

9    able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

10   as well as the contents of the various public statements issued by Starbucks.

11   **Starbucks' Code Of Conduct**

12       114.    Starbucks' Code of Conduct begins with a commitment to "the highest standards

13   of ethical conduct and behavior."

14       115.    The Code of Conduct applies to "all partners, officers, and board of directors, as

15   well as temporary service workers and independent contractors" of Starbucks, and violations of

16   the Code of Conduct will lead to "disciplinary action up to, and including, dismissal."

17       116.    In a section titled "Compliance with Laws and Regulations," the Code of Conduct

18   states:

19          Starbucks is committed to full compliance with the laws, rules and regulations of
            the countries in which it operates. You must comply with all applicable laws, rules
20          and regulations when performing your duties. When you think a conflict exists be-
            tween the Standards and an applicable law, rule or regulation, or if you have a ques-
21          tion concerning the legality of your or other partners' conduct, you should consult
            with your manager or Ethics & Compliance.

22       117.    In a subsection titled "Conflicts of Interest," the Code of Conduct states the follow-

23   ing, in pertinent part:

24

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

> We all have a duty to avoid situations that create a conflict of interest. A conflict of interest can occur when you or a family member have a personal interest, activity, or relationship that could interfere or appear to interfere with your ability to make objective business decisions in the best interest of Starbucks.

118.    In a subsection titled "Fraudulent Activity," the Code of Conduct states, in pertinent part, that:

> Starbucks partners are expected to assess and implement anti-fraud processes and controls, safeguard our assets, be honest and trustworthy in their business dealings and disclosures, comply with applicable laws and regulations and report any known or suspected internal or external misconduct.

119.    In a subsection titled "Books and Records," the Code of Conduct states, in pertinent part, that "all partners must ensure the accuracy and integrity of Starbucks corporate records. This includes reliability and accuracy of books and records, as well as full, fair, accurate, timely and understandable public disclosure."

### Starbucks' Audit Committee Charter

120.    Pursuant to Starbucks' Audit Committee Charter, the Audit Committee is responsible "for overseeing the accounting and financial reporting processes of Starbucks Corporation (the 'Company') and the internal and external audit processes."

121.    The Audit Committee Charter further states that the purpose of the Audit Committee is to assist the Board in "fulfilling its oversight responsibilities by reviewing the financial information that will be provided to shareholders and others, the systems of internal control that management and the Board have established, the Company's risk management practices, and compliance with the Company's Standards of Business Conduct."

122.    In a section titled "Responsibilities," the Audit Committee Charter states that the Audit Committee shall "[s]elect, appoint, determine funding and other retention terms for, oversee, and, if the Committee determines necessary or appropriate, replace, the independent auditors."

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

123.    The Audit Committee Charter further tasks the Audit Committee with the following:

Review the Company's quarterly and annual financial results with management and the independent auditors. This review includes:

- The financial statements and related disclosures to be included in the Company's annual Report to Shareholders, the Annual Report on Form 10-K, the Quarterly Reports on Form 10- Q, or similar publicly filed documents

- Information to be discussed in the Company's quarterly earnings announcements, including the internal controls around these processes.

- Non-GAAP financial measures reported by the Company in its quarterly earnings announcements or publicly filed documents, including the internal controls around these processes.

- Significant or complex transactions not a normal part of the Company's operations.

- Any off-balance sheet structures.

- The Company's critical accounting policies and estimates and related disclosures in the Company's publicly filed documents.

- The chief executive officer and chief financial officer disclosure and certifications under Sections 302 and 906 of the Sarbanes-Oxley Act.

- Significant management judgments and accounting estimates.

- Significant changes in the Company's accounting policies or their application, or alternative GAAP treatments discussed with the independent auditor, including the reasons for changes made at the Company's discretion.

- Adjustments proposed by the independent auditors.

- The independent auditors' audit opinion, inclusive of critical audit matters ('CAMs'), their judgment on the quality of the Company's accounting policies and financial reporting, and other matters they are required to communicate to the Committee under applicable professional standards.

- Any fraud or other irregularity (whether or not material) that involves management or other partners who have a significant role in the Company's internal control environment.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

124.    With respect to internal controls over financial reporting, the Audit Committee Charter states that the Audit Committee shall:

> Review management's assessment of the effectiveness of the Company's internal controls over financial reporting and the independent auditors' related attestation. Consider with management, internal audit, and the independent auditors whether any changes to such internal controls are appropriate, including the adequacy of the Company's internal controls. Discuss any material weakness or significant deficiency in the design or operation of internal control over financial reporting and the Company's remediation plan until resolution. Review any related significant findings and recommendations of the independent auditors and internal audit together with management's response.

125.    With respect to risk oversight and risk management, the Audit Committee states that the Audit Committee shall:

> Review periodically and discuss with management the Company's major and emerging risk exposures, including financial, operational, legal, and regulatory risks, the steps the Company has taken to monitor and control such exposures, and the Company's risk management programs, policies, and procedures. The Committee may delegate review and oversight of specific risks, or categories of risks, to another committee of the Board, as appropriate. Regularly report to the Board the substance of such reviews and discussions.

126.    With respect to legal and ethical compliance, the Audit Committee Charter states that the Audit Committee shall:

127.    Review and discuss the overall adequacy and effectiveness of the Company's legal, regulatory, and ethics and compliance programs including the Company's Standards of Business Conduct, the Code of Ethics for the CEO, COO, CFO, and Finance Leaders, and the Policy for the Review and Approval of Related Person Transactions Required to be Disclosed in Proxy Statements. Review with management the Company's processes and systems to monitor compliance with these standards and applicable legal requirements.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

128.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

129.    Starbucks is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

130.    Plaintiff is a current shareholder of Starbucks and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

131.    A pre-suit demand on the Board of Starbucks is futile and, therefore, excused. At the time this action was commenced, the eleven-member Board was comprised of Defendants Allison, Campion, Ford, Knudstorp, Mohan, Servitje, Sievert, and Zhang (the "Director Defendants"), along with Non-Parties Mayer, Moyo, and Niccol, each of whom joined the Board after the Relevant Period. Plaintiff is required to show that a majority of the Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least nine of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

132.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 36

**Corr Cronin LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

133.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

134.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

**Demand is Excused as to Defendant Allison**

135.    Defendant Allison is not disinterested or independent. Defendant Allison has served as a Company director since 2019 and is a member of the Audit Committee. As detailed herein, Defendant Allison receives substantial compensation for his service as director.

136.    Defendant Allison also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Allison is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue

**Demand is Excused as to Defendant Campion**

137.    Defendant Campion is not disinterested or independent. Defendant Campion has served as a Company director since 2019 and served as Chair of the Audit Committee. As detailed herein, Defendant Campion receives substantial compensation for his service as director.

138.    Defendant Campion also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 37

Defendant Campion is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

**Demand is Excused as to Defendant Ford**

139.    Defendant Ford is not disinterested or independent. Defendant Ford has served as a Company director since January 2023. As detailed herein, Defendant Ford receives substantial compensation for her service as director.

140.    Defendant Ford also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Ford is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

**Demand is Excused as to Defendant Knudstorp**

141.    Defendant Knudstorp is not disinterested or independent. Defendant Knudstorp has served as a Company director since January 2017 and serves as a member of the Audit Committee. As detailed herein, Defendant Knudstorp receives substantial compensation for his service as director.

142.    Defendant Knudstorp also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Knudstorp is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

**Demand is Excused as to Defendant Mohan**

2      143.    Defendant Mohan is not disinterested or independent. Defendant Mohan has served

3    as a Company director since January 2024. As detailed herein, Defendant Mohan receives sub-

4    stantial compensation for his service as director.

5      144.    Defendant Mohan also personally reviewed, signed, authorized, and/or made the

6    false and misleading statements alleged herein during earnings calls, in SEC filings, press releases,

7    and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defend-

8    ant Mohan is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot con-

9    sider a demand to sue.

10     **Demand is Excused as to Defendant Servitje**

11     145.    Defendant Servitje is not disinterested or independent. Defendant Servitje has

12    served as a Company director since January 2024. As detailed herein, Defendant Servitje receives

13    substantial compensation for his service as director.

14     146.    Defendant Servitje also personally reviewed, signed, authorized, and/or made the

15    false and misleading statements alleged herein during earnings calls, in SEC filings, press releases,

16    and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defend-

17    ant Servitje is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot con-

18    sider a demand to sue.

19     **Demand is Excused as to Defendant Sievert**

20     147.    Defendant Sievert is not disinterested or independent. Defendant Sievert has served

21    as a Company director since January 2024. As detailed herein, Defendant Sievert receives sub-

22    stantial compensation for his service as director.

23

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 39

148.    Defendant Sievert also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Sievert is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

**Demand is Excused as to Defendant Zhang**

149.    Defendant Zhang is not disinterested or independent. Defendant Zhang has served as a Company director since October 2023 and serves as a member of the Audit Committee. As detailed herein, Defendant Zhang receives substantial compensation for her service as director.

150.    Defendant Zhang also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Zhang is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

**Demand is Excused as to Defendant Nadella**

151.    Defendant Nadella is not disinterested or independent. Defendant Nadella has served as a Company director from 2017 to May 30, 2024. As detailed herein, Defendant Nadella received substantial compensation for his service as director.

152.    Defendant Nadella also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Nadella is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**Demand is Excused as to Non-Party Niccol**

153.    Non-Party Niccol is not disinterested or independent. Niccol has served as the Company's CEO and as Chairman of the Board from September, 2024 to present and, as detailed above, received approximately $95.8 million in total compensation in 2024.

154.    As CEO, Niccol also fails the Nasdaq's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Niccol could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Niccol is futile.

**Demand is Excused as to Non-Party Mayer**

155.    Non-Party Mayer is not disinterested or independent. Mayer has served as a member of the Board from June, 2025 to present and, as detailed above, receives substantial compensation for her service as director. As such, Mayer cannot be considered independent or disinterested with respect to members of the Compensation and Management Development Committee.

**Demand is Excused as to Non-Party Moyo**

156.    Non-Party Moyo is not disinterested or independent. Moyo has served as a member of the Board from June, 2025 to present and, as detailed above, receives substantial compensation for her service as director. As such, Moyo cannot be considered independent or disinterested with respect to members of the Compensation and Management Development Committee.

**Demand is Excused as to All Members of the Audit Committee**

157.    Defendants Allison, Campion, Knudstorp and Zhang served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 41

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    underlying internal controls and procedures over financial reporting, and the audits of the financial

2    statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to

3    the Company by failing to prevent, correct, or inform the Board of the issuance of material mis-

4    statements and omissions regarding the Company's business and the adequacy of its internal con-

5    trols as alleged above. Therefore, the Audit Defendants cannot independently consider any demand

6    to sue themselves for breaching their fiduciary duties to the Company, as that would expose them

7    to substantial liability and threaten their livelihoods.

8       158.    The Director Defendants, as members of the Board, were and are subject to the

9    Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties

10   required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the

11   Company's standards of business conduct. The Director Defendants violated the Code of Conduct

12   because they knowingly or recklessly participated in making and/or causing the Company to make

13   the materially false and misleading statements alleged herein. Because the Director Defendants

14   violated the Code of Conduct, they face a substantial likelihood of liability for breaching their

15   fiduciary duties, and therefore demand upon them is futile.

16      159.    All of the Board's current members derive substantial revenue from the Company,

17   control the Company, and are indebted to each other. These conflicts of interest have precluded

18   the Board's current members from calling into question the Director Defendants' conduct. Specif-

19   ically, none of the Board's current members have taken remedial action to redress the conduct

20   alleged herein. For instance, none of the Director Defendants have sought to enforce the Com-

21   pany's Clawback Policy, which provides that "the Company may seek reimbursement with respect

22   to incentive compensation paid or awarded to executive officers . . . in the event of a financial

23   restatement or misconduct."

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 42

160.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

161.    The acts complained of herein constitute violations of fiduciary duties owed by Starbucks' officers and directors, and these acts are incapable of ratification.

162.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Starbucks. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Starbucks, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

163.    If there is no directors' and officers' liability insurance, then the directors will not cause Starbucks to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

164.    Thus, for all of the reasons set forth above, a majority of Starbucks' current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### *Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5*

165.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

166.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Starbucks. Not only is Starbucks now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Starbucks by the Individual Defendants.

167.    During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $227.5 million to repurchase roughly 8.9 million shares.

168.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

169.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 44

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Starbucks not misleading.

170.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Starbucks.

171.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

172.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 45

175.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's Reinvention plan and its risk oversight function.

176.    The 2024 Proxy was used to solicit shareholder votes in connection with the election of Defendants Allison, Campion, Ford, Hobson, Knudstorp, Mohan, Nadella, Narasimhan, Servitje, Sievert, and Zhang to serve for another one-year term on the Company's Board.

177.    In addition, the 2024 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Narasimhan and Ruggeri. While the shareholder vote was non-binding, the 2024 Proxy indicated that the "the board and the Compensation Committee will review and consider the voting results when making future decisions regarding our executive compensation program."

178.    Describing the Company's "Compensation Philosophy," the 2024 Proxy indicated that executive compensation is performance based: "[t]he vast majority of pay for our executive officers is at-risk and performance-based."

179.    The materially false and misleading statements contained in the 2024 Proxy regarding the Company's Reinvention plan and its risk oversight function therefore misleadingly induced shareholders to vote in favor of the election of Defendants Allison, Campion, Ford, Hobson, Knudstorp, Mohan, Nadella, Narasimhan, Servitje, Sievert, and Zhang to serve for another one-year term on the Company's Board, and performance-based compensation to officers of Starbucks, including Defendants Narasimhan and Ruggeri, to which they were not entitled.

180.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 46

## COUNT III

### *Against the Individual Defendants for Breach of Fiduciary Duty*

181.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

183.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

184.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

186.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    damages in the Securities Class Action, and damage to the share price of the Company's stock,

2    resulting in an increased cost of capital, and reputational harm.

3    ### COUNT IV

4    ### *Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty*

5    187.    Plaintiff incorporates by reference and realleges each and every allegation con-

6    tained above, as though fully set forth herein.

7    188.    By encouraging and accomplishing the illegal and improper transactions alleged

8    herein and concealing them from the public, the Individual Defendants have each encouraged,

9    facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defend-

10    ants have each aided and abetted, conspired, and schemed with one another to breach their fiduci-

11    ary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct

12    complained of herein.

13    189.    Plaintiff, on behalf of Starbucks, has no adequate remedy at law.

14    ### COUNT V

15    ### *Against the Individual Defendants for Unjust Enrichment*

16    190.    Plaintiff incorporates by reference and realleges each and every allegation con-

17    tained above, as though fully set forth herein.

18    191.    By their wrongful acts, violations of law, and false and misleading statements and

19    omissions of material fact that they made and/or caused to be made, the Individual Defendants

20    were unjustly enriched at the expense of, and to the detriment of, Starbucks.

21    192.    The Individual Defendants either benefitted financially from the improper conduct,

22    or received bonuses, stock options, or similar compensation from Starbucks that were tied to the

23

24

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

performance or artificially inflated valuation of Starbucks, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

193.    Plaintiff, as a shareholder and a representative of Starbucks, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

194.    Plaintiff, on behalf of Starbucks, has no adequate remedy at law.

## COUNT VI

### *Against the Individual Defendants for Abuse of Control*

195.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196.    The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

197.    As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

198.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT VII

### *Against the Individual Defendants for Waste of Corporate Assets*

199.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

200.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time-period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 49

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

201.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

202.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

203.    Plaintiff, on behalf of Starbucks, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 50

1    Dated: December 16, 2025                Respectfully submitted,

2                                            **CORR CRONIN LLP**

3                                            */s/Colin George*
                                             Colin George, WSBA No. 45131
4                                            1015 Second Avenue, Floor 10
                                             Seattle, WA 98104
5                                            Telephone: (206) 501-3544
                                             cgeorge@corrcronin.com
6
                                             **THE ROSEN LAW FIRM, P.A.**
7
                                             Phillip Kim (*pro hac vice* forthcoming)
8                                            275 Madison Avenue, 40th Floor
                                             New York, NY 10016
9                                            Telephone: (212) 686-1060
                                             Email: philkim@rosenlegal.com
10
                                             *Counsel for Plaintiff*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 51